1999-NMCA-037

976 P.2d 1030

**Janet WEST, Worker–Appellee,**

v.

**HOME CARE RESOURCES, and USF & G, Employer/Insurer–Appellants.**

**No. 19061.**

Court of Appeals of New Mexico.

Feb. 5, 1999.

Gerald A. Hanrahan, Albuquerque, for Appellee.

Robin A. Goble, Alice Tomlinson Lorenz, Miller, Stratvert & Torgerson, P.A., Albuquerque, for Appellants.

## OPINION

ALARID, Judge.

{1} Home Care Resources and its Insurer, United States Fidelity and Guarantee (USF & G) (collectively Respondents), appeal from the compensation order of the Workers' Compensation Judge (WCJ) determining that Janet West (Worker) is entitled to permanent partial disability (PPD) benefits. On appeal, Respondents argue that the WCJ erred in determining how the credit for benefits previously paid should be allowed and that the Worker's claim for unpaid benefits is barred by the statute of limitations. For the reasons discussed below, we hold that the WCJ did not abuse her discretion in determining the manner in which the credit would be applied. Accordingly, we affirm the compensation order.

*FACTS*

{2} We note at the outset that there were many factual issues in dispute below. However, on appeal Respondents do not challenge the facts as found by the WCJ, and thus, those facts are binding on appeal. *See Stueber v. Pickard*, 112 N.M. 489, 491, 816 P.2d 1111, 1113 (1991).

{3} Worker was employed by Home Care Resources as a Home Health Aide. On May 26, 1992, she injured her head, neck, and right shoulder when a heavy fan that had been sitting on a table fell on her. Respondents began paying her temporary total disability (TTD) benefits on May 27, 1992, the day after the accidental injury. In addition, Worker began receiving medical treatment from Dr. Quito Osuna Carr. On February 23, 1993, Dr. Carr determined Worker had attained maximum medical improvement

(MMI) and had a sixteen percent impairment rating. By letter dated March 4, 1993, Respondents advised Worker that she was entitled to permanent partial disability (PPD) benefits at the rate of forty-five percent. Respondents began paying PPD benefits at that rate. The WCJ found that the parties agreed that Worker was entitled to PPD benefits at forty-five percent or $43.73 per week, for 463 future weeks, absent a change of circumstances.

{4} In March 1993, Worker filed an affidavit and petition for a partial lump-sum settlement to pay debts. Respondents stipulated to this, and an order was entered approving the lump-sum settlement. The order specifically stated that "worker shall be awarded a total sum of $2,656.00 as and for partial compensation with remaining compensation paid pursuant to the Workers' Compensation Act." Following the entry of this order, Respondents continued to pay PPD benefits. In April 1993, a second lump-sum settlement in the amount of $3,696.61 was approved by stipulation of the parties. The order approving the second lump-sum payment again stated "with remaining compensation paid pursuant to the Workers' Compensation Act." Neither of the lump-sum settlement orders specified when or how the remaining compensation payments would be made.

{5} Respondents ceased paying PPD benefits on or about April 28, 1993. Worker continued to receive treatment for her injuries from Dr. Carr and Respondents continued to pay for all the treatment ordered by Dr. Carr. Later, a dispute developed concerning medical treatment.

{6} On September 16, 1996, Worker filed a complaint with the Workers' Compensation Administration seeking enforcement of the previous lump-sum orders to the extent that they required Respondents to pay benefits, PPD benefits retroactive to the date of MMI, and a redetermination of her PPD benefits based on changes that had occurred since 1993. Respondents' formal answer raised a number of issues, including a credit for benefits previously paid, the defense of the statute of limitations, NMSA 1978, Section 52–1–31 (1987), and various issues concerning the

effect of the lump-sum orders. Prior to trial, the parties stipulated that Respondents were entitled to a credit for benefits previously paid.

{7} Respondents do not challenge the WCJ's calculations concerning the amount of the credit, which included the credit for the two lump-sum distributions that had been made, and therefore we will not discuss them. However, after determining the amount of the credit, the WCJ chose to apply the credit from the date that the Respondents stopped paying PPD benefits, forward. In effect, the WCJ determined that the two lump-sum settlements constituted payments from the date Respondents stopped paying benefits, April 28, 1993, through February 13, 1996. Thus, the WCJ determined that Worker had complied with Section 52–1–31 by filing her complaint on September 26, 1996, within one year of the time that the credit ran out and thus Respondents, in effect, ceased paying compensation.

*DISCUSSION*

{8} On appeal, Respondents argue vehemently that the WCJ's manner of allocating credit for previous payments contravenes the provisions and policies of the Workers' Compensation Act (the Act), NMSA 1978, §§ 52–1–1 to –70 (1929, as amended through 1993), and this Court's decision in *Paternoster v. La Cuesta Cabinets, Inc.*, 101 N.M. 773, 689 P.2d 289 (Ct.App.1984). In addition, Respondents continue to argue that Worker's claim is barred by Section 52–1–31(A). In support of both arguments, Respondents contend that the WCJ's action is contrary to established policy and violates notions of fundamental fairness. We disagree.

{9} We begin our analysis with *Paternoster*, where this Court held that overpayments of benefits made by mistake and in good faith prior to the date of judgment should be applied as a credit against future benefits. 101 N.M. at 776–77, 689 P.2d at 292–94. We recognized that the Act did not specifically provide for such a credit, but held that it was required as a matter of fundamental fairness. Recognition of credit advanced the interests of workers by encouraging employers to make voluntary, prejudgment payments of compensation

credits and advanced the interests of employers by ensuring that in the end they would pay no more than was required. *See id.* at 777, 689 P.2d at 293.

{10} In *Paternoster,* we also addressed the manner in which such credits were to be applied. The parties had agreed that the trial court's order meant that the worker would not receive any more benefits until the credit had been paid off dollar-for-dollar, a period of five years. *See id.* at 776, 689 P.2d at 292. Mindful of the strong statutory policies in favor of periodic rather than lump-sum payments, this Court noted that unless the overpayment is equal to or exceeds the value of the compensation award, the credit should be applied in such a manner as to avoid immediate termination of the worker's benefits. *See id.* at 778, 689 P.2d at 294. The "central scheme" we referred to was the clear preference of the Act for periodic rather than lump-sum payments. We went on in *Paternoster* to outline several acceptable ways in which to determine a credit for overpayment, depending on the facts and circumstances of the particular case. These included a dollar-for-dollar credit taken off the end of the compensation period, a reduction in the amount of each payment provided that no "significant reduction" in the amount of each payment occurred, or a credit based on the number of weeks rather than a dollar-for-dollar credit. *See id.* at 779, 689 P.2d at 295. In summary, we held that the trial court had discretion to

> make an award of credit which balances the compensation goals of the Act against the principle of fundamental fairness toward the employer. The trial judge must take into account the following factors: (1) the circumstances under which overpayment occurred, and (2) the impact of a dollar-for-dollar credit on the value of periodic payments awarded to the worker.

*Id.* Thus, under *Paternoster,* the WCJ had wide latitude in selecting the appropriate method for applying credit for overpayment, and our view is limited to whether the WCJ has committed an abuse of that discretion.

{11} Respondents argue that Worker's claim for unpaid benefits accrued on or about April 29, 1993, when they first failed to pay benefits, and was barred approximately one year later by Section 52–1–31(A), which reads in pertinent part as follows:

> If an employer or his insurer fails or refuses to pay a worker any installment of compensation to which the worker is entitled under the Worker's Compensation Act ... after notice has been given ... it is the duty of the worker insisting on the payment of compensation to file a claim therefor as provided in the Worker's Compensation Act not later than one year after the failure or refusal of the employer or insurer to pay compensation .... if the worker fails to file a claim for compensation within the time required by this section, his claim for compensation, all his right to the recovery of compensation and the bringing of any proceeding for the recovery of compensation are forever barred.

Respondents argue that a worker's mistaken belief concerning the amount of benefits or coverage under the Act does not prevent the running of the statute of limitations. *See Coslett v. Third Street Grocery,* 117 N.M. 727, 733–34, 876 P.2d 656, 662–63 (Ct.App. 1994). In a similar vein, Respondents argue that the way the WCJ applied the credit for the lump sum payments made to Worker frustrates the purposes and policies of Section 52–1–31(A) and violates notions of fundamental fairness.

{12} We do not disagree with Respondent's citations and concerns in the abstract. In another context they would carry much force. We do disagree with their application to this case. The issue before us is simply how lump-sum payments are to be treated for the purposes of the statute of limitations. This is a wholly different issue from the more commonplace instance of an employer initially failing or refusing to provide benefits under the Act. It also raises different concerns than those inherent in lump-sum allocation cases such as *Paternoster.*

{13} In the unusual factual circumstances of this case, we hold that the WCJ did not abuse her discretion by applying the credit to the period of time in which Respondents were not in fact paying benefits. We recognize, as did the WCJ that it is custom-

ary to apportion the credit for lump-sum payments by shortening the number of weeks that compensation is paid; that is, by applying the credit at the back-end of the weekly compensation award. This generally serves the salutary purpose of ensuring that compensation payments will continue to be made biweekly, which, as Respondents recognize, is consonant with the statutory scheme. However, in this case, Respondents had in fact stopped paying benefits, and the WCJ was powerless to effect a continuation of benefits. The WCJ had to decide how to allocate the credit for lump-sum payments *without* the guidance of the policy goals spoken of in the *Paternoster* opinion. In that light, it was no abuse of discretion to depart from *Paternoster* for the specific and limited purpose of determining the running of the limitations period. Applying the credit to the time that Respondents were not paying benefits strikes us as a fair balancing of the compensation goals of the Act and the principles of fairness owed to the Respondents. Treating a lump-sum payment as though it had been periodic payments for purposes of the statute of limitations is particularly appropriate when the order approving the lump-sum payment does not specify the amount or dates of payment of the balance of compensation due.

{14} As Professor Larson notes in a discussion of the effect that voluntary payments of compensation have on calculating the limitations period: "When payment is in lump sum, the [statute of limitations] period runs not from the payment itself but from the time the last payment would have been made if the benefits had been paid periodically." 7 Arthur Larson & Lex K. Larson, Larson's Worker's Compensation Law § 78.43(a) (1998). This position has been adopted by a number of courts. *See Southern Cotton Oil Co. v. Friar*, 247 Ark. 98, 444 S.W.2d 556, 558 (1969); *University of Denver v. Industrial Comm'n of Colo.*, 138 Colo. 505, 335 P.2d 292, 294 (1959) (en banc); *Allen v. IBP, Inc.*, 219 Neb. 424, 363 N.W.2d 520, 523–24 (1985); *Anderson v. Public Serv. Elec. & Gas Co.*, 114 N.J.L. 515, 177 A. 865, 867 (1935); *Haney v. State Compensation Comm'r*, 138 W.Va. 303, 76 S.E.2d 753, 755 (1953). As the Supreme Court of Arkansas noted:

Let it be remembered that the lump sum payment is not an advantage to the claimant; in making this settlement, the company is not mistreated in any manner. The lump sum settlement is frequently of benefit to all parties. The claimant receives the cash, and is able to pay bills which may have accumulated during his absence from work, and the company receives the benefits of a 4% discount when the accrued compensation is paid in a lump sum. Were appellant's view to be adopted by this court, the employer would receive an additional benefit, i.e., the statute of limitations would be shortened.

*Southern Cotton Oil Co.*, 444 S.W.2d at 559 (footnote omitted). We note also, as did the Arkansas court, that paying compensation owed in advance by means of lump-sum payment saves the company the bookkeeping and clerical expenses associated with paying compensation. *See id.* at 559 n. 6a.

{15} We recognize that limitations periods are meant to "compel the exercise of a right of action within a reasonable time so that the party against whom the action is brought will have a fair opportunity to defend." *Moncor Trust Co. v. Feil*, 105 N.M. 444, 446, 733 P.2d 1327, 1329 (Ct.App. 1987) (citations omitted). The limitations period is also meant to protect a party "from being sued after evidence vanishes and memories fade." *Investment Co. of the Southwest v. Reese*, 117 N.M. 655, 662, 875 P.2d 1086, 1093 (1994). We note, however, that statutes of limitations require a party to initiate proceedings within the limitations period, not to conclude them within that time. This is not a case in which a Worker suddenly initiated proceedings years after the injury. On the contrary, as the record in this case demonstrates, Respondents were well aware of the situation, voluntarily began paying compensation to Worker the day after the accident, and in fact stipulated to the entry of two lump-sum orders that specifically directed that additional payments be made pursuant to the Act. By law, lump-sum payments require the approval of a Workers' Compensation Judge and thus require that proceedings of some type be initiated. *See NMSA 1978, § 52-5-12 (1993). This in turn requires that

the employer and insurer be notified of the petition. As a practical matter, we doubt that employers and insurers agree to payment of compensation benefits in a lump-sum unless they have already investigated the circumstances surrounding the accident and the disability. In short, Respondent's policy argument is not supported by the record in this case.

{16} In a similar vein, Respondents argue that Worker's delay in filing her claim for increased compensation until September of 1996 deprived them of any opportunity to independently investigate her medical condition during 1993, 1994, and 1995. The argument, however, ignores the record in this case. After the lump-sum payments, Worker continued to receive medical treatment from Dr. Carr, her authorized health care provider, at Respondents' expense. As Worker points out, pursuant to NMSA 1978, Section 52-10-1 (1990) and WCA Rule 11 NMAC 4.7.7, Dr. Carr was required to provide Respondents with written reports prior to being paid. Moreover, Respondents in fact sent Worker to a different physician for an Independent Medical Examination (IME) in early 1996. The physician who performed the IME included in his report a discussion of the medical records concerning Worker from 1993, 1994 and 1995. Based on the results of the IME, Respondents determined that they would no longer pay for certain medical treatments. The WCJ found that there were three changes that resulted in increased compensation: (1) In September 1996 Worker's treating physician downgraded her residual physical capacity from light to sedentary; (2) a new edition of the AMA Guides took effect, resulting in a downgrading of Worker's impairment rating; and (3) Worker turned sixty years of age in July 1997, which increased her age modification points. Respondents have not challenged on appeal the determination that Worker was entitled to benefits at an increased rate on and after September 1996.

{17} Finally, Respondents argue that the WCJ's ruling reduces the one-year statute of limitations to a fiction and leads to the absurd result of establishing a different statute of limitations for each claimant, depending on the facts of the case. However, as our Supreme Court recently pointed out in *Torres v. Plastech Corp.*, 1997–NMSC–053, ¶ 11, 124 N.M. 197, 947 P.2d 154, the statute of limitations does not begin to run on a claim until the worker is disabled. Moreover, because the Act defines four different forms of disability—total disability, temporary total disability, permanent partial disability, and scheduled injury—the event that triggers the running of the statute of limitations is different for the different forms of disability. *See id.* ¶¶ 15–27.

## CONCLUSION

{18} The compensation order of the WCJ is affirmed. On remand, the WCJ shall determine the attorney fees to be awarded to Worker for the successful services of her attorney in defending this appeal.

{19} **IT IS SO ORDERED.**

BOSSON and BUSTAMANTE, JJ., concur.